JUDGE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ELAINE MARIE THOMAS, <br><br> Defendant. | No. CR20-5244 BHS <br><br> DEFENSE SENTENCING MEMO |

## I. SUMMARY

Elaine Thomas is 67 years old and has no criminal history. Until this case, she was a highly respected metallurgist who enjoyed an excellent reputation. She now stands before the Court to be sentenced to one count of fraud relating to her work. Ms. Thomas falsely certified that a number of metal castings had passed tests relating to strength and toughness. The metals in question were fabricated into submarines for the United States Navy. The case is unusual in that Ms. Thomas did not financially benefit from her fraud at all. Her false certifications, however, required the Navy to conduct costly tests to insure that the structural integrity of the submarines had not been compromised. Thankfully, the Navy determined that the submarines could be safely operated.

In a Complaint brought against Ms. Thomas's former employer, the government alleged that the company for which Ms. Thomas worked improperly gave false assurances to the Navy concerning the nature and extent of the false certifications.[1] The

---

[1] *United States v. Bradken*, CR20-5220, dkt. 1.

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 1

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

company subsequently entered a Deferred Prosecution Agreement,[2] which obligates the company to enact protective measures to ensure that no similar offense could happen again. The company has also remediated funds to cover the costs of the Navy's testing.[3] No restitution is therefore applicable in this case.[4]

Ms. Thomas is good person who let a number of work pressures cause her to make bad decisions. No one could seriously suggest that she will ever offend again. And had the protective measures set forth in the Deferred Prosecution Agreement been in place during Ms. Thomas's tenure, this offense would not likely have happened, since she would have been insulated from the aforementioned work pressures.

The USPO has recognized the unique circumstances of this case do not call for a sentence within the guideline range. It therefore recommended a sentence of 24 months of incarceration. Recognizing that Ms. Thomas is unlikely to reoffend, it recommended only twelve months of supervision, conditioned primarily on attending moral reconation therapy.

The defense agrees that this case hardly calls for a sentence within the guideline range, since the underlying guideline is heavily flawed, as several courts have noted. The facts of this case do not call for a custodial term at all. Ms. Thomas never intended to place any sailor at risk and is gratified that the Navy's testing compels the conclusion that she has not. She is now a convicted felon, and beats herself up constantly for not being strong enough to assert herself when she could have prevented all of this from happening. That sounds so easy now, but it was not then. Ms. Thomas has acknowledged that her hubris contributed to her offense, but she was also a woman

---

[2] *Id.*, dkt. 2.

[3] PSR at ¶ 91.

[4] *Id.*

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 2

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

working in a field dominated by men, working in an environment where pushing back was not easy. She suffers from a panic disorder that would make incarceration extremely problematic and does not deserve to be incarcerated during a pandemic, when the conditions of confinement are especially severe. And given breaking news reports of sexual misconduct by BOP correctional officers, serious questions exist over BOP's ability to safely care for women inmates. Finally, a custodial sentence would be difficult to square with another recent high-profile case in which the Department of Justice granted deferred prosecutions to two government actors who falsified data to cover up negligence that contributed to another's death.

A probationary sentence is appropriate and just. If allowed to be released, Ms. Thomas will continue to volunteer her time in the community in which she lives. The defense recommends a five-year probationary term, conditioned on one-year of home confinement, 1,000 hours of community service, and the payment of a $100,000 fine.

## II. BASIS FOR RECOMMENDATION

### A. Elaine Thomas's background

Ms. Thomas grew up poor. She lived in rural communities and for much of her childhood did not even have indoor plumbing or running water. PSR ¶¶ 50-53. She applied herself at school and earned an academic scholarship to Washington State University, where she obtained an additional scholarship for being the first woman to study materials science. PSR ¶ 54. In 1975, she graduated with a Bachelor of Science in Materials, Science and Engineering. PSR ¶ 71. She obtained work as a metallurgist, but suffered significant discrimination, based on her gender. PSR ¶ 55. She worked as a metallurgist at Bradken for roughly forty years. PSR ¶ 74. Her sharp intellect and commitment to her work allowed her to become a leading expert in her field with an impeccable reputation: "she earned several awards, received calls from all over the

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 3

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

world for her expertise, and was a mentor to others."[5] She still volunteers her time in that capacity. PSR ¶ 58.

On the personal side, she was married for 35 years to Gerald Graham, a former veteran who shared her love for the outdoors. The two of them studied to become Certified Rescue First Responders for the City of Auburn, and planned to live out their retirement volunteering in this capacity, gardening, and raising chickens. PSR ¶ 58-59. But the world had other plans: Mr. Graham passed away about one year ago, in January 2020. Ms. Thomas describes caring for him in his final days as the greatest honor of her life. She now lives with his adult daughter, who had been residing with Elaine and Gerald for about the last four years, rent free. PSR ¶ 59.

Ms. Thomas today is fairly healthy, having survived a brush with breast cancer in 2007. PSR ¶ 58, 63. She does, however, suffer from an endocrinological-based panic disorder, the symptoms of which include a dramatic loss of blood pressure, losing consciousness, and losing control of bodily functions. PSR ¶ 65. She is prescribed Xanax and Zoloft to help control this disorder. PSR ¶ 65.

Despite the current charges, Ms. Thomas retains broad support in the community. Former coworkers, family, and friends have written letters of support. Each attests to Ms. Thomas's general goodness and struggles to explain this offense. All stand solidly behind her. Most will attend sentencing. Collectively, these letters are attached as Exhibit 1.

**B. The unusual nature of the offense supports a probationary sentence.**

This case is unlike the typical governmental fraud case. It is unique in that Ms. Thomas did not personally gain anything by making the false certifications. She was

---

[5] USPO Sent. Rec. at 4.

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 4

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

not enriched in any way. The loss figure at issue in this case[6] is not related to any funds that Ms. Thomas received, but to costs of testing that the Navy undertook to confirm that the falsely certified steel could be safely used in nuclear submarines. As is detailed below in Section III.C., the Navy concluded that it could: no nuclear submarines have been permanently pulled from service. PSR ¶ 26. Nor were the false certifications necessary for Ms. Thomas to keep her employment. She was a highly respected metallurgist. As such, she could have obtained work elsewhere, if such a thing were necessary (for example, if an ugly confrontation ensued from her advising her employer that the testing demands were unreasonable or unworkable).

So why did this confounding[7] offense happen? As noted in Ms. Thomas's letter of responsibility,[8] her moral compass was thrown off course by a variety of factors. The quality assurance department in which she worked was not independent from the production department. The result of this was that she felt pressure to meet production goals. And contrary to what should be testing norms, a third-party witness was not on-site to alleviate the pressure that can otherwise mount on technicians to meet such goals. She sometimes felt she had too little material to test, causing her to be too cautious to perform retests. And she was a women working in field dominated by men. She endured much sexism, and sometimes could not command the respect that her intellect deserved. She felt that she did not have a clear pathway to resolve testing

---

[6] For purposes of the guideline calculation, the parties agreed to estimate the loss amount as being between 9.5 and 25 million dollars. PSR ¶ 2.

[7] Several letters of support and USPO's recommendation struggle to find a clear motivation for this offense. *See, e.g.*, USPO recommendation at 5 ("Ms. Thomas' conduct is somewhat confusing . . . . it is difficult to understand Ms. Thomas' true motivation for committing this offense.").

[8] Attached to PSR.

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 5

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

problems, including inadequate equipment. A relative notes that while she has a brilliant technical mind, she sometimes has difficulty relating to people and adjusting to new situations.[9] She does not deal well with conflict. As such, she found it hard to stick up for what was right. When a material failed a test, she would evaluate the surrounding circumstances to discern whether the failure was in fact material. These evaluations were founded in science, but allowed her too much room to inject her own subjective beliefs, which were likely influenced by the production pressures she was feeling. This environment caused her to make compromises, and each rationalization made others easier still. Ms. Thomas worked hard to describe how these compromises came to pass in her letter. Part of that explanation is as follows:

> When test results would fail the specification, I evaluated all of them, the chemistry, and each heat treatment cycle. For example, I used metrics such as the Yield:Tensile ratio to evaluate the strength of the quench. I used the fracture appearance of the tensile to evaluate the presence of hydrogen damage. The rate of the quench off the austenitizing cycle is a critical component of the heat treatment. If the casting cools too slow, the properties suffer. I had to argue for maintenance to be performed on heat treat equipment. This was especially true of our quench tank which collected debris on the bottom effecting water flow. Cleaning the tank was deemed expensive which made it difficult to get the work approved. Eventually, I developed a test to "look" for slow water movement in the quench tank. Each time test results failed, I made myself identify the reason so I would be confident the material could meet properties if properly heat treated. If the reason was a chemistry issue, the casting would be scrap. I sent many castings back through heat treatment. This resulted in passing mechanical tests.
>
> Only if we were running out of test material and I could not find a reason for low -100F Charpy result would I resort to raising the test data. As noted above, I now regret that I did this and understand that it was wrong. Believe me, I understand. But I do not believe that the products shoddy, and here is why. The -100F tests on the average varied by 24% while the 0F data varied by 14%. This reflects the difficulty of maintaining -100F in the bath for the Charpy specimens. The bath was Pentane (freezing point -200F) and it was cooled using liquid nitrogen (boiling point -320F). Icy puddles of pentane would float on the top of the bath just a few centimeters above the test specimens. Our temperature thermocouple was in the corner of the bath. I'm quite sure we were actually testing well below -100F. Pentane puddles indicate a -200F region was just above the specimens. I was out of ideas as to how to correct this and unaware of other options. The special agent showed me a photo of a new machine Bradken has purchased to control the temperature. It was good to see that they finally recognized the problem needed attention. This should prevent anyone else from making the same mistakes that I made.

Letter of Elaine Thomas at 3.

---

[9] Letter of Diane Thomas Hart to the Court (November 30, 2021) (included in support letters attached as Exhibit 1).

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 6

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

The idea that the pressurized environment in which she worked contributed to her poor decision-making is perhaps circumstantially demonstrated by her employer's response to the fraud, which arguably reinforces the idea that the company was, at least at the time the fraud was uncovered, more concerned with meeting production goals than quality assurance goals. According to the Complaint filed by the government, after the employer came to believe that Ms. Thomas had in fact falsely certified a number of test results, the company issued a series of misleading letters of assurances that initially denied that any fraud occurred, and then minimized its scope. *See* Complaint at ¶¶ 16-23 (CR20-5220), dkt. 1. And the Deferred Prosecution Agreement entered between the company and the government declared the company's internal controls to prevent fraud were insufficient at the time of the offense. *See* DPA at ¶ 6(i), (CR20-5220), dkt. 2. That agreement obligates the company enact a variety of corrective measures, including equipment upgrades, the creation at least seven new positions relating to quality assurance, and the creation of an audit and risk committee. *Id.* at ¶ 10(c).[10]

---

[10] In relevant part, this paragraph recites:

> c. Bradken has undertaken, and is continuing to undertake, substantial steps to restore its operational integrity and substantial remedial measures to prevent any recurrence of fraudulent conduct within the company, including immediately separating with the employee responsible for the Subject Conduct, undertaking equipment upgrades, creating new positions, and implementing new processes. The new positions and personnel include a Quality Control Support Specialist whose role is to verify all heat treatment and testing was compliant to specification requirements; a Test Block Expeditor whose function is to track and monitor all test materials from the point that a casting is released from heat treatment through final testing; a Heat Treat Manager position created to support the company's efforts to improve oversight of the heat treatment department (previously the Director of Metallurgy managed both the heat treatment and metallurgy lab departments); two new heat treatment operators to support monitoring and control in the heat treat department; a second metallurgist who will support the increased process monitoring and control within the metallurgy lab; and a new internal auditor position who will perform internal audits of processes, procedures and specific products on a continuing basis. Bradken's

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 7

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Ms. Thomas has shamed herself by what she has done. As noted in her letter of responsibility, she sacrificed her well-deserved excellent reputation for no good reason:

> I find myself embarrassed, mortified, and sorry for what I've done. The feeling of remorse has followed me for years at this juncture. This stage of the process just confirms all the bad feelings and self-loathing I've experienced. I take this opportunity to summarize why I did not choose to be the better person that I've always expected.
>
> While I accept the role that I played in falsifying data, I want you to know that I never set out to do any such thing. I never believed (nor do I believe today) that I ever approved into production any casting that would compromise the integrity of the submarines or place sailors lives at risk. I understand that testing thus far has not suggested that their integrity was compromised. I find solace in that.
>
> I hope you can understand that I am not a bad person. I lost the guidance of my moral compass over the years. The loss was a gradual one. Essentially, little pieces of that compass got chipped away over time until it no longer functioned correctly. I gained nothing from changing the data. The only thing I gained was a damaged reputation, and I treasured my good reputation. If I could turn back time, I would. I wish I could fix all of this somehow. This is not at all how I envisioned my retirement years.

Letter of Elaine Thomas at 1 (attached to PSR).

### C. The Sentencing Guidelines produce a patently absurd advisory guideline range in this case.

Ms. Thomas has absolutely no criminal history. She has never been arrested before. She has not even had so much as a speeding ticket. No party to this action will suggest that Ms. Thomas presents even a miniscule risk of reoffending. There is no dispute that Ms. Thomas's Criminal History Category sits at the lowest possible level, I, with zero points.

Despite all this, the United State Probation Office has calculated an advisory guideline range of 70 to 87 months. PSR ¶ 81. The defense believes the correct advisory guideline range is slightly lower, 57 to 71 months, as it contends that a two-point enhancement for conscious or reckless risk of death or serious bodily injury has been improvidently applied. (*See* USSG § 2B1.1(b)(16)). But regardless of which range the

---

Board of Directors has created an Audit and Risk Committee that will be responsible for overviewing and auditing risk and compliance processes across the company . . . .

Deferred Prosecution Agreement at 9, ¶ 10(c), CR20-5220, dkt. 2

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 8

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Court lands upon, the determined range will greatly exaggerate Ms. Thomas's moral culpability, due to fundamental flaws that infect the broader fraud guideline, as will be explained in detail below. The advisory range therefore should not be relied upon as benchmark for an appropriate sentence, especially given the peculiar facts of this case.

The basis for the defense objection to the two-point enhancement of USSG § 2B1.1(b)(16) is detailed at page 21 of the PSR. The government bears the burden of proving this enhancement, *United States v. Newhoff*, 627 F.3d 1163, 1170 n.19 (9th Cir. 2010), and it cannot do so.

Rigorous testing conducted by the Navy has not shown that Ms. Thomas's false certifications have resulted in infirm submarine hulls. Stated another way, no sailor lives have been shown to be put at risk, recklessly or otherwise.

According to James Geurts, Assistant Secretary of the Navy for Research, Development and Acquisition, the Navy is "comfortable with the safety of our sailors" related to the falsely certified material already in existing submarines and "confident in the materials" that were falsely certified, but had not, at the time of the remedial testing, been used to construct new submarines:

> Assistant Secretary of the Navy for Research, Development and Acquisition James Geurts said the Navy had evaluated the potential risks for suspect steel that was used to build Navy submarines from a Washington state foundry owned by Bradken, Inc.
>
> "We have done the work to understand any potential risk, and believe we have mitigated any potential risk for our in-service submarines," Geurts said in response to a question to USNI News. "It did cost us some time to go do the exploration to make sure that we were comfortable with the safety of our sailors."
>
> . . . .
>
> Geurts said the Navy also evaluated submarines under construction for problems derived from the steel.

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 9

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

> "We have done a sweep of any material that was in the queue for new construction submarines. That's a little easier because it isn't in the submarine yet, and we're confident in the material for any of the new construction submarines," he said.
>
> "We are working closely with the company and have instituted additional audits and inspections in reviewing with them and Electric Boat to ensure that we won't have a repeat of this."

Sam LaGrone, "*Navy Has 'Mitigated' Risk of Suspect Steel From Company in Federal Fraud Case*," USNI News (June 19, 2020) (article attached as Exhibit 2).

In light of this, the government cannot meet it burden in providing the necessary risk level required to apply USSG 2B1.1(b)(16)).

But as noted, the Guideline range for this case is flawed regardless of whether the contested provision is applied. This is because the fraud guideline – with its unwarranted heavily reliance on loss amounts – produces advisory ranges that are often "irrational on their face," and such is the case here. *See United States v. Gupta*, 904 F.Supp.2d 349 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn [] on this single factor [loss or gain], the Sentencing Commission effectively ignored [3553(a)] and . . .effectively guaranteed that many such sentences would be irrational on their face"); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]").

As many courts have observed,[11] the amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence": defendants rarely set out to defraud others of a specific amount of money;

---

[11] *See, e.g., United States v. Fry*, 792 F.3d 884, 893 (8th Cir. 2015) (Bright, J., concurring in part and dissenting in part) ("Many courts and commentators state the Guidelines related to fraud convictions do not present a reasonable starting point for sentencing.") (citing multiple examples)

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 10

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

rather, the amount of loss is dependent on the security procedures in place and the point in time when the fraud happens to be detected. *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).

> As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. It is no wonder that Judge Stefan Underhill, concurring in a recent Second Circuit opinion, called the loss enhancement Guideline "fundamentally flawed, especially as loss amounts climb." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring).

*United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018).

As stated by Judge Underhill in *Corsey*, 723 F.3d at 380, "The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." Judge Underhill's concurrence recounted how "[e]ach of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission" and quoting approvingly the observation in *Adelson*, 441 F. Supp. 2d at 515, that "the calculations under the guidelines have so run amok that they are patently absurd on their face").

While in this case the false certifications extended over a lengthy period of time and related to materials used in critically important machines, neither of those two facts justify the produced advisory range, be it either 57 to 71 months (according to the defense) or 70 to 87 months (according to the USPO and the government). The idea that Ms. Thomas needs to be incapacitate by incarceration until well into her seventies ought to be considered irrational and absurd on its face, as the *Gupta* and *Adelson* courts suggested.

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 11

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

The reason why the Guideline here produces such an excessive result is that it is primarily driven by the multi-million dollar loss amount, which here leads to a 20-point bump that dwarfs the base level of the guideline itself. PSR ¶¶ 32-33. As the *Emmenegger*, *Corsey*, and *Johnson* courts observed, this bump is not supported by empirical study and is a poor measure of culpability. That is especially true here, since – unlike most fraud cases – Ms. Thomas did not misappropriate any funds or seek to enrich herself.[12]

That either guideline range suggests perversely severe punishments is also reflected by the fact that the high-end of each advisory range is fairly close to the maximum possibility penalty (120 months). PSR ¶ 80. That the Guideline suggests punishments approaching the maximum possible punishment for fraud for a first time offender who inured no financial benefit should give this Court pause.

//
//
//
//
//

---

[12] Ms. Thomas acknowledge that her false certifications required costly testing by the Navy and that Navy will have to undertake additional monitoring to ensure continued safety. But as noted by Assistant Secretary Geuerts, there is no suggestion that the materials are not in fact safe for their designed use. *See* Exhibit 2. And the Navy has already been made whole for its loss by Bradken corporation, which as noted, has now agreed to provide additional auditing and quality assurance procedures – including, presumably, the third party witness to testing that Ms. Thomas had long wanted, see Ms. Thomas's Acceptance of Responsibility Letter at 2, attached to PSR, and which would have alleviated some of the pressure placed upon her, see Letter of James Tschimperle to the Court at page 2 (December 30, 2021) (questioning why no third-party witnesses were provided, noting that it should be standard practice) (included in support letters, attached as Exhibit 1).

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 12

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

**D.     Ms. Thomas has been severely punished already. The likelihood of re-offense is infinitesimal. A custodial term would amount to more punishment than is necessary.**

At the conclusion of the sentencing hearing, Ms. Thomas will be a convicted felon. Because nuclear submarines are involved in this case, her offense has been widely publicized in the media. The shame associated with this offense has caused Ms. Thomas to undertake serious reflection, some healthy, some not. As Ms. Thomas described it above, her remorse included significant self-loathing.[13] Here is how others describe her regret and the price she has already paid:

> Elaine is my older sister by just under three years and we have lived near each other our entire lives until I moved to Texas in 2018. I first became aware of the matter when it came out in the paper. When our brother went to see her, she was able to tell him about her legal situation and he has gone with her to court. I still support and love her. We keep in contact weekly by telephone, FaceTime, and text. My sister has never before been in trouble with the legal system. It is a shocking departure from my experience of her character and behavior. I do not know how it started or why; she and I cannot yet talk about it. I do feel her shame and see the fear and she has expressed to me remorse for what she has done.
>
> I know she is sorry. Loss of her status and job has affected her deeply.
>
> This past year during COVID, her husband passed away after a brief illness. They had been married since the late 1980's. My sense is she misses him but is relieved he is not here for the tense period she is going through. She is grieving his loss while facing sentencing. We have not been able to talk openly about parts of her future because there is a lot of pain. Her near future is unknown.

Letter of sister Diane Thomas Hart to the Court (November 30, 2021) (included in letters of support, attached as Exhibit 1).

> These last two years has seen her life's work, all she that she has accomplished from the beginning of her career as a young woman, she struggled to proof herself as a capable woman in a male dominated work place. All her awards and place in the world as a renowned Metallurgist wiped out.
>
> Then to make her more miserable, she lost her husband Gerry to a quick illness & death. She has more than paid the price for her error in judgement.

---

[13] Letter of Acceptance at 1 (attached to PSR).

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 13

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Letter of former coworker and friend James Tschimperle to the Court at page 2 (December 30, 2021) (included in letters of support, attached as Exhibit 1).

> I consider Elaine my mentor during my professional career at Bradken. She has helped me understand the processes and procedures to better myself. She was always there to explain things to me in an easy to understand way and I looked up to her for how much knowledge she has about Metallurgy. She truly lived for Metal! Elaine gave me her ear to listen to my complaints and frustrations at work. Our professional relationship extended into our personal life and Elaine and I built a very strong personal friendship, where I learned more about her as a person.
>
> Elaine is a kind hearted person. She cares about and loves people, which she has shown on a daily basis in her interactions with coworkers and customers. All I ever heard was how amazing Elaine is in what she does and what a nice person she is. What I really like about Elaine is that she is simple but intelligent.
>
> The alteration of test results that Elaine admitted to, surprised me, as I trust Elaine. This seems very out of Character for the honest person that I know her to be. The only explanation I could offer as to why she did it, is that she either has done it because she knew the results were not a true reflection of the quality of the metal or that this is how it has always been done in the past. It is hard for me to believe that she did this for any other reason as she had nothing to gain or lose by doing this.
>
> I do know that she is deeply remorseful for what she has done and the tremendous burden she has put on Bradken and its Customers and I know she would do anything to fix this, as she meant no harm to anyone.
>
> Elaine has been going through a very difficult time the last few years. Her world fell apart. Retirement and carrying this burden, the pandemic, and unfortunately losing her best friend and husband Jerry. She truly was looking forward to spending more time with him during her retirement years, tending to her garden, taking bike rides and going canoeing.

Letter of former coworker and friend Karina Lambert to the Court (January 11, 2022) (included in letters of support, attached as Exhibit 1).

//
//
//
//
//
//
//

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 14

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

> I became aware of Elaine's legal trouble when it was reported in the news. That was quite a shock. I never imagined Elaine would engage in behavior so compromising to her integrity. It does not fit with my experience of her character throughout all the years that I have known her.
>
> It is apparent to me that Elaine's loss of employment and reputation has weighed heavily on her. She clearly regrets and is remorseful for her actions. She has also recently suffered the loss of her husband who passed away after a brief illness during this past year. Her husband's daughter from a previous marriage has been living with Elaine and her husband for a number of years and continues to be dependent on Elaine for housing and other living expenses.
>
> It's my hope that the court's discipline of Elaine will give consideration to her age and station in life and that it will not involve incarceration.

Letter of brother-in-law Neal T. Hart to the Court (December 10, 2021) (included in letters of support, attached as Exhibit 1).

> The ability to stand one's ground against others with a more popular position can be difficult and often results in confrontation. Elaine has always been a logical person committed to doing what is rational and supported by data; however, she is not one to fight back in the face of confrontational aggressive views. It is my understanding that this is part of why she did what she did. I cannot explain or justify changing the data as she has done. To her credit she did maintain records of the original results, which did leave a trail that allowed for full disclosure upon discovery and did not hinder the government's investigation.
>
> Elaine has expressed much remorse for falsification of the test results. She wishes that she would have had the courage to stand up to the pressure and have forced the issue to a mutually acceptable and openly understood resolution. I am sure she wants to continue as a mentor for female metallurgist and if allowed to do so would be able to use this error in judgement to educate them on the need for full transparency and accuracy when reporting test results and to stand firm in the face of unethical pressure to alter any data records. Being a recognized industry Metallurgical expert has been my sister's life for the last 40 years. She is very aware that her actions have gutted her reputation and legacy in the industry. This damage is the greatest punishment she could suffer.
>
> I live in the area and see Elaine often. I have and will continue to be here to support Elaine regardless of the outcome of the sentencing.

Letter of brother Robert Milton Thomas to the Court (December 3, 2021) (included in letters of support, attached as Exhibit 1.)

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 15

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

**E.     The Bureau of Prisons cannot be trusted to safely care for Ms. Thomas.**

It is an open secret that the BOP has been horribly managed for years. Its inability to safely harbor inmates throughout the pandemic has brought some of that mismanagement to the fore. *E.g.*, Keri Blakinger, "*People in the Scandal-Plague Federal Prison System Reveal What They Need in a New Director*," The Marshall Project (January 14, 2022) (attached as Exhibit 3). Unfortunately, a story that broke only two days ago highlights that Ms. Thomas could be exposed to inhumane conditions of confinement simply by virtue of her gender. The closest federal prison that houses female inmates is FCI Dublin. Thus, if Ms. Thomas were given a custodial sentence, it is likely that the BOP would designate her to serve that sentence there. Inmates housed at that institution have been "subjected to rampant sexual abuse by correctional officers and even the warden [and the chaplain], and where threatened or punished when they tried to speak up." Associated Press, "'*Rape club': Women's Prison in Dublin fostered culture of sexual abuse, inmates say*," Desert Sun (February 6, 2022) (attached as Exhibit 4). The have been multiple arrests of FCI Dublin BOP officials for a variety of sexual assaults. *Id.* To call the situation disturbing is a gross understatement. The unfortunate reality is that the sexual abuse of female inmates within the BOP cannot be assumed to be rare events. *Id.*; *see also* Balkinger, supra, Exh. 3 at 4 (noting complaints of sexual abuse against women inmates at FCI Oakdale). There is no reason place Ms. Thomas into an environment where she could become another victim. A probationary sentence is appropriate.

//
//
//
//
//

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 16

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

**F.   A custodial sentence would be dissimilar to another recent high-profile case in which two BOP officials failed to adequately supervise an inmate on suicide watch, and then falsified records to cover up that they failed to fulfil their duties, which contributed to the inmate's death.**

A comparison to another recent high profile case shows that a custodial term for Ms. Thomas would constitute more punishment than necessary. The Department of Justice granted deferred sentences to two Bureau of Prisons correctional officers who falsified documents explicitly designed to ensure the safety of detainees (namely, to guard against suicide). *See* "Jeffrey Epstein prison guards spared jail time in deal with US prosecutors," Associated Press (May 22, 2021) (article attached as Exhibit 5). Those cases have now been dismissed, as reported here:

https://abcnews.go.com/US/prosecutors-drop-charges-correctional-officers-connection-jeffreyepstein/story?id=82018907. A non-custodial sentence is thus necessary here to avoid an unwarranted sentencing disparity.

## III. CONCLUSION

There is no penological need for Ms. Thomas's incarceration. The Court should impose a five-year probationary sentence contingent on her satisfying one year of electronic home confinement, performing 1,000 hours of community service, and paying a $100,000 fine. If this case did not involve nuclear submarines, few would question the reasonableness of such a sentence. Correlatively, the fact that nuclear submarines are involved should not mandate imprisonment when none is needed. The community would be better served if Ms. Thomas were allowed to continue to contribute to it.

DATED this 7th day of February, 2021.

*s/ John R. Carpenter*
Assistant Federal Public Defender
Attorney for Elaine Thomas

DEFENSE SENTENCING MEMO
(*United States v. Thomas*, CR20-5244 BHS) - 17

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710