The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| UNITED STATES OF AMERICA, | NO. 20-05244BHS |
|---|---|
| Plaintiff | **SENTENCING MEMORANDUM** |
| v. | |
| ELAINE THOMAS, | |
| Defendant. | |

## I. INTRODUCTION

For 32 years, Elaine Thomas betrayed the trust of the United States Navy, knowingly placing its sailors and military operations at risk. A highly-trained and renowned metallurgist, Thomas oversaw the lab at the Bradken steel foundry in Tacoma. The Navy trusted Thomas to faithfully report and certify the test results that measure the strength and toughness of steel castings used to form the hulls of our nation's nuclear submarines.

Thomas knew that approximately half the castings produced under her supervision did not meet Navy specifications that ensure submarines can survive collisions or other traumatic events. But, for decades, she kept this fact secret from the Navy and others at Bradken. Instead, she altered test results for approximately 240 productions of steel, and

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 1

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

submitted sworn certifications representing that the productions met the Navy's specifications, knowing full well they did not. Thomas earned a reputation as a pioneer in her industry for what appeared to be her skill at consistently producing steel that met stringent specifications.

In 2017, another Bradken engineer discovered that Thomas had falsified test results for a single casting. Because Thomas had overseen Bradken's lab for more than three decades, the Navy feared that this discovery could be just the tip of the iceberg. Investigators and Navy engineers were charged with the urgent task of determining which other castings failed to meet the specifications, and the degree to which this placed lives and operations at risk. Even under these dire circumstances, which she herself had created, Thomas failed to assist the Navy in assessing the damage. After initially admitting to Bradken that she had altered a single test result, Thomas recanted, and told federal investigators that she had not falsified any results at all. This left federal agents and Navy engineers to sort through 32 years' worth of records to identify and assess the substandard castings. Two years later, investigators confronted Thomas with indisputable evidence of the fraud. Thomas responded that the government's specification—a well-established test developed to prevent hulls from cracking at sea in cold temperatures—is a "stupid requirement."

The Navy expended nearly $14 million—including over 50,000 hours of work—unravelling and remediating Thomas's fraud. Thankfully, no sailors have been harmed. The Navy has implemented additional monitoring practices that it believes will ensure the integrity of the submarines going forward, but those will entail even more costs and potential operational disturbances. Importantly, the Navy was able to take these steps only because Thomas's fraud was detected. If Thomas had succeeded in concealing the failing test results forever, as she intended, sailors would continue to face undue risks to this day.

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 2

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The sentence in this case must be sufficient to reflect the aggravated nature of this extraordinary crime: Thomas's deliberate decision to cause the installation of inferior steel in submarines; the fact that she did so for over 32 years; her unfathomable choice to place our servicemembers at risk; and the tremendous economic cost her fraud imposed on the Navy. Of particular importance, the sentence must be sufficient to deter others in the industry who, like Thomas, would be tempted to submit falsified test results based on their own determination that a required specification is "stupid." In light of these factors, and others discussed below, the government recommends a sentence of 70 months of imprisonment, a $50,000 fine, and three years of supervised release.

In support of this recommendation, the government is submitting four statements—three from the Navy and one from Bradken. First, the statement of Rear Admiral David Goggins, the Navy's Director and Program Executive Officer for Attack Submarines, describes the impact of Thomas's fraud on the Navy. *See* Exhibit A. Second, the Declaration of Technical Warrant Holder Gregory Archer, a metallurgist, explains the importance of the Navy's specifications and the dangers resulting from castings that do not meet them. *See* Exhibit B. Third, the Declaration of Dr. Matthew Draper specifically addresses comments previously made by Ms. Thomas that the Navy's Charpy specifications are "stupid," and explains the rationale for those specifications. *See* Exhibit C. Dr. Draper will also orally address the Court on behalf of the Navy at sentencing. Finally, the statement of Nathan Heisler, Bradken's President-Specialty Products, North America, outlines the impact on Bradken of Thomas's fraud. *See* Exhibit D.

## II. BACKGROUND

### A. The Use of High-Yield Steel in Naval Submarines

For 40 years, defendant Elaine Thomas served as a metallurgist at the Tacoma steel foundry formerly known as Atlas, and now operated by Bradken, Inc. The foundry was the Navy's only supplier of high-yield steel castings for nuclear submarines. Over most of her career, Thomas served as Bradken's Chief Metallurgist. In that role, she was

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 3

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

responsible both for supervising Bradken's production of high-yield steel, and for overseeing Bradken's testing of the steel castings to ensure they met the Navy's standards. Based on her apparent success at meeting these standards, Thomas gained recognition as an industry leader. In 2015, the Steel Founders' Society of America awarded Thomas the prestigious Briggs Medal for career contributions to the field of metallurgy.

High-yield steel is engineered to meet exacting specifications. Engineers developed these standards following several maritime disasters that occurred in cold water, including the sinking of the Titanic (when the ship's rivets sheared off due to contact with an iceberg in cold temperatures), and incidents during World War II, when United States Liberty ships split in half in cold water. Ex. C ¶ 5. The Navy's specifications are intended to ensure that accidents like these do not happen again. *Id.* The specifications are set out in a document known as "TechPub 300." There are two grades of high-yield steel, which are known as HY-80 and HY-100.

A production of steel, which typically includes multiple castings, is called a "heat." Under TechPub 300, each heat of high-yield steel must be subjected to a series of tests. The foundry performs the tests on representative samples of steel taken from a block of steel known as test block that is produced as part of the heat. The foundry then prepares and submits to the prime contractor a certification (a Certified Metallurgical Test Report) reporting the test results. The prime contractor may only install the castings on a Navy submarine if the certification shows that the casting satisfies TechPub 300, or if the Navy grants a special exception. Elaine Thomas was the Bradken employee responsible for reviewing test results and preparing the certifications.

**B.     The Importance of Charpy and Yield Strength Tests**

One of the tests prescribed by TechPub 300 is known as the Charpy V-notch test. The Charpy test evaluates the toughness of the steel, that is, the amount of force the steel can withstand, including at very cold temperatures. As explained in the Declaration of Gregory Archer, the test "is a vital measure in determining how the steel will perform

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 4

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

during an impact or explosion, such as those that might occur in battle situations or while operating in deep waters where collisions with undersea mountains or other objects have occurred." Ex. B. ¶ 4. The "specification is designed to ensure to the maximum extent possible that a submarine that has experienced an impact or explosion can survive and the crew can make it safely back to shore." *Id.*

To conduct a Charpy test, lab personnel cool a sample of the steel to a prescribed temperature and strike it with a heavy pendulum. The test machine measures the amount of energy the specimen absorbs on impact, which reflects the toughness of the steel. The Navy's specifications require that the Charpy test be performed three times at 0 degrees Fahrenheit, and three times at -100 degrees Fahrenheit. To qualify as high-yield steel, the tests conducted at 0 degrees must return an average result of 70 foot-pounds, with all three results equal to or greater than 65 foot-pounds. The tests conducted at -100 degrees must return an average result of 50 foot-pounds, with all three results equal to or greater than 45 foot-pounds.

Thomas has criticized the -100 degree Charpy test on the basis that submarines do not operate in environments as cold as -100 degrees. A complete discussion of the rationale for the -100 degree Charpy test is set out in the Declaration of Dr. Draper. Ex. C ¶¶8-10. To summarize, while it is true that submarines are unlikely to actually encounter temperatures as low as -100 degrees, results of tests conducted at that temperature provide important information about how the steel will perform at higher temperatures that submarines *are* expected to encounter. *Id.* at ¶ 10. As a result, these specifications have been in place since 1961, and are well-established both at the Navy and in commercial industry. *Id.* ¶ 3. The Navy explicitly briefed Ms. Thomas on the importance of meeting these requirements. *Id.* ¶ 11.

The second test at issue here is known as the "tensile," or "yield strength" test. This test measures the amount of force the steel can withstand before it permanently deforms. Under TechPub 300, HY-80 steel must withstand 80,000 pounds of force per

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 5

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

square inch (psi) before yielding. HY-100 steel must withstand 100,000 pounds psi. Submarine castings must have "this level of strength in order to ensure the safety of routine operations." Ex. B ¶ 3. "Steel failing to meet these requirements presents increased risk of failure under normal operational loading, and could potentially result in the loss of ship or submarine, and the potential lives of sailors, in the most extreme cases." *Id.*

C.  **Bradken Discovers Thomas's Fraud**

In May 2017, a junior Bradken metallurgist discovered discrepancies in Bradken's databases while researching past Bradken test results. PSR ¶ 23. Bradken's records for a certain casting showed that Thomas had reported passing -100 degree Charpy test values (53, 47, and 56 foot-pounds) on the certification to the prime contractor. *Id.* ¶¶ 23-24. However, the values in Bradken's internal database were failing values exactly 20 foot-pounds lower (33, 27, and 36 foot-pounds) than the certified and reported results. *Id.* When the junior metallurgist retrieved the original test card that the lab staff had used to record the results, she found that someone had altered the handwritten results on the card. Dkt. 1 ¶ 32 (Complaint and Affidavit of SA Jodi Crawford).

Bradken management questioned Thomas about the discrepancies. Thomas initially admitted that she had changed the test results for the heat at issue from failing to passing. *Id.* ¶ 33. When asked whether Thomas had falsified other results, she responded, "hardly ever," suggesting that she had falsified results on other occasions. *Id.* ¶ 34. However, in a follow-up interview with Bradken and its attorneys, Thomas recanted, stating that she never would have falsified the data and that there must have been a "legitimate explanation" for the discrepancy. *Id.* ¶ 40.

Following its discovery of the original fraudulent certification, Bradken discovered more recent test results showing that Thomas had engaged in a practice known as "cherry picking." *Id.* ¶¶ 35-38. These incidents involved productions that had initially passed some tests and failed others. *Id.* Thomas had ordered that the steel be "reheated," that is, placed back in the oven in an effort to change the heat's properties to

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 6

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

meet the specifications. *Id.* Following the reheat process, the steel again passed some tests but failed others. *Id.* On her certification, Thomas had improperly combined the passing test results from the first set of tests with the passing results from the second set of tests, and omitted the failing values from both sets of tests, to falsely make it appear that the steel met all specifications. *Id.*

**D.     The Department of Defense Discovers the Vast Scope of Thomas's Fraud**

Bradken reported the discrepancies to the prime contractor, which in turn reported the issue to the Navy. Federal agents with the Defense Criminal Investigative Service and the Naval Criminal Investigative Service interviewed Thomas in June 2017. Dkt. 1 ¶ 51. During the interview, Thomas denied that she had purposefully changed any test results, and insisted she had no motive to do so. *Id.*

Despite Thomas's denials, the Navy was concerned that Thomas's fraud could extend beyond the incidents reported by Bradken. To further investigate, a Navy engineer compared data from the two Bradken databases that showed the original discrepancy. *Id.* ¶ 46. The Navy engineer identified numerous cases where the two databases showed different results for the same tests. *Id.* The engineer also noticed that, in many cases, the discrepancies followed a pattern. *Id.* Where two different values were reported for the same test, it was common for the digit in the "ones" location to be the same between the two values, while the digit in the "tens" column would be changed to create a passing score. *Id.* For example, the value recorded in the internal database would be a failing value of 44, whereas the value in the certification would be a passing value of 54. This was the same pattern that the junior metallurgist had observed in her initial discovery.

After identifying this pattern, federal investigators took custody of all of the original notecards that Bradken lab employees used to record test results. Over six months, investigators and the Navy engineer reviewed approximately 1,700 notecards for signs of alterations. This process identified 240 productions where at least one test card had been altered to change the result from a failing value to a passing value. *Id.* ¶ 49. This

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 7

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

represented about 50% of all of the castings Bradken produced for the Navy for the period between 1985 and 2017. *Id.*

E. **The Navy Remediates Thomas's Fraud at Great Expense**

The discovery of Thomas's fraud caused alarm at the Navy, as it involved the prospect both of risk to a sailors and the inability to operate submarines critical to national security. In response, the Navy undertook what Rear Admiral Goggins describes as a four-year, "monumental effort . . . to ensure the safety of our sailors." Ex. A at 3. Because of national security concerns, many of the details of that effort are confidential. However, the process involved removing portions of the castings from operational submarines, rendering them unavailable for any operational activities while the testing was conducted. *Id.* In some cases, castings that had not yet been installed on submarines were lost, either because the Navy chose to scrap the castings based on their test results, or because the testing process destroyed the casting. *Id.* at 2. In economic terms, the Navy estimates this process cost approximately $11.39 million in engineering expenses and $2.45 million in shipyard costs, for a total of nearly $14 million. *Id.* at 3. This includes approximately 50,000 work hours—the equivalent of 24 Navy employees working on the matter full time for an entire year. *Id*.

Following this review process, the Navy concluded that all submarines containing affected castings can continue to operate safely. However, the Navy identified many castings that will require lifetime monitoring to ensure that the castings do not develop cracks that could compromise the integrity of the hulls. Ex. B ¶ 6. The monitoring process will require the periodic removal of all coatings from the castings, the inspection and testing of the casting, the repair of defects, and the re-application of coatings. *Id.* This is a significant cost that is not included in the $14 million figure discussed above and cannot be quantified yet as it is a situation of first impression for the Navy *Id.*

F. **The Department of Justice Resolves Claims Against Bradken**

On April 30, 2020, the United States Department of Justice and Bradken entered into a civil settlement under which Bradken paid the United States approximately $10.9

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 8

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

million in damages for losses caused by Thomas's conduct. On June 15, 2020, the United States Attorney's Office filed an information charging Bradken, Inc. with one count of Major Fraud Against the United States for Thomas's scheme to submit fraudulent certifications to the prime contractor. *United States v. Bradken,* CR20-5220BHS Dkt. 1. The same day, the parties entered into a Deferred Prosecution Agreement (DPA). *Id.*, Dkt. 2. Under the DPA, Bradken admitted responsibility for Thomas's conduct. *Id.* at 6. Under the Deferred Prosecution Agreement, Bradken agreed to comply with an administrative compliance agreement, and to make a public statement about the misconduct. If Bradken complies with all terms of the DPA, the charge will be dismissed in June 2023.

### G. The Consequences to Bradken of Thomas's Conduct

The government's investigation did not produce any evidence that Bradken's management or other employees had any knowledge of, or knowingly participated in, Thomas's fraud. Nonetheless, her conduct caused substantial harm to the company in numerous ways. For example, Bradken reports that its employees spent at least 15,000 hours assisting the Navy with its response to the fraud. Ex. D at 1. As a result, the company's production fell behind promised delivery dates. *Id.* Bradken also notes that the incident has caused reputational damage to the company, putting "centuries of hard work and service in jeopardy." *Id.*

Furthermore, Thomas's conduct resulted in a sense of betrayal among her colleagues. Over her 40 year-tenure at Bradken, Ms. Thomas developed close relationships of trust with many colleagues, who were stunned to learn that she had been lying about the company's products for decades. The company reports that "Ms. Thomas's actions caused significant mental and physical health issues for our employees, and negatively and irrevocably damaged careers of dedicated professionals." *Id.*

Finally, Thomas's conduct had severe economic consequences for Bradken. In addition to the $11 million settlement with the government discussed above, Bradken

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 9

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

reports spending nearly $3 million in attorney fees and $854,000 in employee labor costs responding to the fraud. *Id.*

**H.      Thomas Admits the Fraud and Pleads Guilty**

As discussed above, Thomas denied falsifying any test results when federal agents interviewed her in 2017. Agents conducted another interview over two years later, in November 2019. Dkt. 1 ¶ 52. By this time, agents had identified the 240 altered test cards, and they questioned her about many of them. Thomas admitted that the handwriting in the altered test card was her handwriting, and admitted that the evidence the investigators had assembled "stinks," but continued to deny intentional fraud. *Id.* ¶¶ 52-52. Later in the interview, Thomas admitted that she would occasionally "round up" the test results if they were "super duper close" to passing. *Id.* ¶ 54. Thomas stated that the -100 degree Charpy requirement was a "stupid number" because submarines do not encounter such cold water. *Id.* ¶ 54.

Agents conducted a final interview of Thomas in December 2019. During this interview, Thomas admitted that at times she would use her "engineering judgment" to change test results from failing to passing. *Id.* ¶ 57. When presented with cases where she had modified test results by as much as 20 or 30 points, Thomas stated that she thought she had "better boundaries" than those reflected in the alterations. *Id.* ¶ 60.

On July 24, 2020, the grand jury returned an indictment charging Thomas with six counts of Major Fraud Against the United States. Dkt. 15. On November 8, 2021, Thomas entered a guilty plea to Count One. As part of her plea agreement, Thomas admitted that, over a period of 32 years, she falsified one or more test results for at least 240 heats of high-yield steel provided to the Navy for installation on submarines. Dkt. 41 ¶ 7(p). The parties further agreed that the economic loss to the Navy is between $9.5 million and $25 million. *Id.* at ¶ 8(b).

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 10

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## III. SENTENCING GUIDELINE CALCULATION

### A. The Guideline Calculation

The government agrees with Probation's calculation of the Sentencing Guidelines, which is as follows:

| Item | Adjustment | Provision |
|---|---|---|
| Base offense level | +6 | 2B1.1(a)(1) |
| Loss exceeding $9,500,000 | +20 | 2B1.1(b)(1)(K) |
| Breach of Position of Trust | +2 | 3B1.3 |
| Risk of death or bodily injury | +2 | 2B(b)(16) |
| Acceptance of Responsibility | -3 | 3E1.1(b) |
| **Total** | 27 | |

Defendant falls into Criminal History Category I. The guideline range for this offense level is **70-87** months.

### B. The Enhancement for Risk of Bodily Injury

Thomas has objected to Probation's application of the 2-point enhancement under USSG § 2B1.1(b)(16), which applies where the defendant's conduct involved "the conscious or reckless risk of death or serious bodily injury." As discussed above and set out in the Declaration of Gregory Archer, steel that fails to meet the Charpy specifications could "result in total loss of the submarine and all its crew." Ex. B ¶ 4. Similarly, the failure to satisfy the tensile specification could "result in the loss of the ship or submarine, and the potential lives of sailors." *Id.* ¶ 3. Thomas's assertion that the Charpy test is "stupid" and not significant from an engineering perspective is addressed in the Declaration of Dr. Draper. Ex. C.

The Ninth Circuit has held that the bodily injury enhancement was properly applied in a case involving facts very similar to this case. *United States v. West Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 992 (9th Cir. 2001)(district court properly applied enhancement where defendant provided false metallurgical testing results to customers for "flight critical" airplane parts); *see also United States v. Trusty,* 68 Fed.

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 11

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Appx. 801 at *1 (9th Cir. 2003) (enhancement properly applied where defendant caused damage to backup systems of aircraft, "increasing the likelihood of a catastrophe"). The enhancement is equally applicable here.

## IV. THE GOVERNMENT'S SENTENCING RECOMMENDATION

### A. The Offense Conduct is Extremely Serious.

The offense conduct here is aggravated in numerous respects. First, and most seriously, Thomas knowingly placed lives and national security at risk. The Navy has carefully developed standards that, in the judgment of its engineers, must be satisfied to ensure the safety of our sailors. The Navy and its sailors trusted Thomas to honestly report whether critical steel castings satisfied these standards. Instead, Thomas substituted her own judgment, deciding that the standards were "stupid" and that she knew better than the rest of the industry. In so doing, she caused her employer to sell, and the prime contractor to install, castings that could have failed in a collision and cost the sailors their lives if the Navy had not implemented additional monitoring protocols. That conduct is, in a word, unconscionable.

Second, both the scope and duration of the fraud are extraordinary. With respect to scope, Thomas falsified test results for 240 productions of steel, representing 50% of the steel Bradken sold the Navy over the offense period. Each of these 240 falsifications constituted its own crime, and each would have been an extremely serious offense standing on its own. With respect to duration, the 32-year span of the fraud may be the longest-running military procurement fraud scheme in history. The sentence must reflect the fact that Thomas chose to continue her fraud over more than three decades—and stopped only when she was caught.

Third, the crime is aggravated by Thomas's failure to assist the Navy in remediating the fraud—and instead to continue to lie about it—after the fraud was discovered in 2017. Thomas knew that her conduct placed the Navy in the extremely difficult position in trying to bound the scope of the fraudulent submissions she made over 32 years. If she had cooperated with her employer and the government, she could

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 12

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

have significantly expedited the process of identifying the affected castings and assessing the risk. Instead, she chose to deny responsibility and leave the Navy to sort through 32 years' worth of records to unwind the fraud.

Finally, even to this day, Thomas appears to maintain the belief that, in the end, she correctly used her judgment to deem the castings safe even though they failed to meet the specifications. After she admitted to falsifying results, Thomas maintained in interviews that her conduct was justified because the government's requirements are "stupid." At the time of her guilty plea, Thomas submitted a statement to the Court that she was "gratified that the government's testing does not suggest that the structural integrity of any submarine was in fact compromised." Dkt. 43. That is simply not true: the Navy resolved that it is safe to continue operating the submarines *only* because it has imposed additional monitoring requirements that will involve additional expense. And, the Navy only knew to impose those requirements because the fraud was discovered.

Even now, Thomas has submitted a letter to the Court arguing that Thomas's view is correct, and that the Charpy test is "unreasonable." *See* Letter of James Tschimperle at 2.[1] Setting aside the fact that this is simply false as a matter of engineering, *see* Exhibit C, Thomas's statements and submissions suggest she fails to grasp the seriousness of substituting her own judgment for that of Navy engineers and the science of metallurgy.

## B. General Deterrence Requires a Significant Sentence

General deterrence is likely the most important Section 3553(a) factor in this case. The military, of necessity, must rely on certifications by third parties that the materials it purchases meet the applicable standards. It would be impossible for the Navy to itself test all of the material installed in its equipment. Therefore, the military can keep its personnel safe, and guard our national security effectively, only if those in Thomas's

---

[1] Mr. Tschimperle relies for support on an article in *Popular Mechanics* by a journalist who appears to lack an engineering background.

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 13

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

position act with integrity. Those who would be tempted to cut corners must see that the consequences of doing so are commensurate with the seriousness of the risk they create.

Thomas is a well-known figure in her field, and the industry will be closely watching the result in this case. As discussed above, Thomas has taken the position that her crime is mitigated by the fact that she was correct that one of the specifications she lied about is "stupid." The sentence must be a clear rebuke to the notion that it is acceptable to ignore specifications, especially in the life-or-death context of military equipment.

C.     **The Defendant's History and Characteristics**

Thomas's history and characteristics are both mitigating and aggravating. On one hand, she has no criminal history or other record of misconduct. She is a highly-accomplished engineer. Based on interviews of other Bradken employees, Thomas was universally liked, trusted, and respected at Bradken. She was regarded as a mentor by the junior engineer who discovered the fraud. All of these characteristics are reflected in the government's recommendation of a low-end sentence. At the same time, Thomas's background leaves no doubt that she knew better than to commit this fraud. And as an engineer, she of all people knew the importance of providing accurate data.

Thomas has asserted that her offense is mitigated by because she had no economic incentive to commit this crime, and her offense therefore was not "motivated by greed." Dkt. 43. It is true that Thomas's motive appears to have more to do with professional pride than greed: Thomas benefitted professionally by hiding from the world the fact that half the steel produced under her supervision did not meet specifications. In part because of her deception, Thomas was viewed as a pioneer in her field, a prestigious award. But whatever her motivation, the fact is that Thomas chose to lie and to put military operations and sailors at risk in service of her own interests.

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 14

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### D. A 70-month Sentence is Proportionate to Other Sentences Involving Procurement Fraud.

Thomas's fraud is unprecedented in its combination of scope, span, and the cost to the Navy. But courts have imposed sentences of several years or more in procurement fraud cases involving significantly lower loss amounts and shorter time periods. For example, *United States v. Bullick,* a case from the Eastern District of Pennsylvania, also involved a defendant who falsified test results for submarine components. *See* E.D. Pa. Cause No. CR10-574. The fraud lasted approximately five years and caused an economic loss to the Navy of approximately $1.35 million, resulting in a guideline range of 37-46 months of imprisonment. Dkt. 26 at 7-8. The court imposed a mid-range sentence of 41 months.

*United States v. Balius*, like this case, involved a lab director who falsely certified lab test results, including tensile test results. *See* D. Or. Cause No. CR17-273. *Balius* involved the sale of aluminum extrusions to private companies, as opposed to military applications, and apparently did not raise safety concerns. The fraud lasted approximately 13 years, resulting in a loss of approximately $1.4 million and a guideline range of 57-71 months. The court imposed a 37-month sentence.

A 70-month sentence is consistent with both *Bullick* and *Balius*. Neither of those cases involved the same safety risks at issue here, and the economic loss in each was approximately 10% of the economic loss caused by Thomas. While *Balius* was itself extraordinary in that the fraud spanned 15 years, it still did not approach the 32-year duration of Thomas's fraud. The sentence here should be significantly longer than either the 41-month sentence in *Bullick* or the 37-month sentence in *Balius*.

### E. A $50,000 Fine is Appropriate

The Sentencing Guidelines provide that "the court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2. (Emphasis added). The guidelines further provide that "the amount of the fine should always be sufficient to ensure that the fine,

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 15

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

taken together with other sanctions imposed, is punitive." USSG § 5E1.2(d). In determining what level of a fine would be appropriate, the court should consider, *inter alia*, the defendant's "earning capacity and financial resources." *Id*. at § 5E1.2(d)(2).

The Sentencing Guideline prescribe a fine in the range of $25,000 to $250,000. The PSR indicates that Thomas possesses adequate financial resources to pay a fine. PSR ¶ 79. Probation's recommended $50,000 fine is proportionate to these resources.

Consistent with the Plea Agreement, the government does not recommend restitution in light of Bradken's civil settlement with the United States.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence Thomas to 70 months of imprisonment, a $50,000 fine, and three years of supervised release.

DATED: February 7, 2022

Respectfully submitted,

NICHOLAS M. BROWN
United States Attorney


*s/ Seth Wilkinson*
SETH WILKINSON
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271

United States v. Thomas, CR20- 5244BHS
Sentencing Memorandum- 16

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970